IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JENNIFER POWELL-FOLKS** | : | |
| | : | **CIVIL ACTION** |
| v. | : | No. 24-5065 |
| | : | |
| **VILLANOVA UNIVERSITY,** | : | |
| **TIA NOELLE PRATT,** | : | |
| **FATHER KEVIN DePRINZO, and** | : | |
| **FATHER ARTHUR PUCARO** | : | |

**McHUGH, J.**                                                                                           **March 10, 2025**

## MEMORANDUM

This is an employment action against Villanova University and several members of its administration, claiming discrimination, a hostile work environment, and retaliation based on race and religion. Specifically, Plaintiff, a Black and African Methodist Episcopal woman, alleges that she was mistreated because she is Black and for failing to comport with Villanova's "Catholic way." Plaintiff alleges that after several discussions about her performance and her attempt to lodge a complaint, she was terminated. Defendants have moved to dismiss all claims asserting a hostile work environment, and the motion will be granted, as the allegations set forth fail to meet the controlling standard for such claims.

**I.      Facts as Pled**

Plaintiff Jennifer Powell-Folks was hired by Villanova, a Catholic university, in January 2022 as its Director of Finance and Administration, a position that reports to the Vice-President for Mission and Ministry. Am. Compl. ¶¶ 10-11, ECF 12. Plaintiff is a Black woman and identifies her religion as African Methodist Episcopal. *Id.* ¶ 5. Throughout the year and ten months that she worked at Villanova, Plaintiff avers that she experienced several instances of harassment and discrimination targeting her race and religion.

Starting in early Fall 2022, the Mission Engagement and Strategic Initiative team began to collect "Lenten season writings" to send out to subscribers of the "Catholic Social thought" publication, as well as to Villanova donors and alumni. *Id.* ¶ 12. At a bi-weekly Office of the Vice President meeting, the Director of Communications explained that they would be gathering testimonials for the publication. Plaintiff expressed that she would love to support in some way, but was promptly told "don't worry about it, you know we accept them from folks who understand the 'Villanova' Lenten practice." (cleaned up). *Id.* ¶ 16. Plaintiff interpreted this to mean that she was not allowed to participate because she is not Catholic. *Id.* ¶¶ 13-17.

Plaintiff also describes several interactions she had with Tia Noelle Pratt, Assistant Vice President. Broadly, Plaintiff asserts that Dr. Pratt "made it clear" to Plaintiff how "Father Peter, the college President, likes her." *Id.* ¶ 18. Separately, Plaintiff asserts that in September 2022, Plaintiff and Dr. Pratt were discussing a painting that Villanova had recently commissioned depicting Saint Augustine, founder of the Villanova order, as a Black man.[1] *Id.* ¶ 19. Dr. Pratt allegedly stated that it "was not in the school's best interest" to broadly advertise the newly commissioned painting because such publicity could be used negatively against the school, and could invite criticism of the school's abrupt shift from their prior depiction of Saint Augustine as a white man. *Id.* Plaintiff contends that Dr. Pratt's comment was racist, because it 1) makes it seem as though Saint Augustine was white when Plaintiff believes he was Black, and 2) acquiesces to Villanova's historically front-facing representation of Saint Augustine as white.[2] *Id.* ¶ 20.

---

[1] Plaintiff asserts that this conversation transpired at a meeting, where Fr. DePrinzo, Fr. Purcaro, and others were also present.

[2] The Court attempts to summarize Plaintiff's explanation of her beliefs. But both Plaintiff's Complaint and her Response Brief are rife with run-on sentences and odd punctuation that make this task difficult. If

Next, Plaintiff alleges that throughout her employment, Fr. DePrinzo, Fr. Purcaro,³ and Dr. Pratt told Plaintiff that she was not "embracing the 'Villanova way.'" *Id.* ¶ 21.  Echoing this sentiment, Plaintiff contends that Human Resources Manager Albert Baladez told Plaintiff that "there is a right way, wrong way, and Villanova way of doing things." *Id.* ¶ 22.  Plaintiff interpreted these comments as criticism for not adhering to a "Catholic way." *Id.*

In October 2022, Plaintiff was called into a supervisory meeting with Fr. DePrinzo, Fr. Purcaro, and Dr. Pratt, where she was criticized for not "embracing the collective process," and told that if she was not comfortable at Villanova, it might not be the best place for her. *Id.* ¶ 24. Plaintiff responded that she did not intend to quit and asked for more specific feedback. *Id.* ¶ 25. Fr. Purcaro then encouraged Plaintiff to be more "collaborative." *Id.* ¶ 26.  Plaintiff pointed out that she worked with staff on their fiscal goals and collaborated with other financial leadership, and asked whether the financial leadership had any issue with her work. *Id.* ¶ 27.  According to Plaintiff, no one had an answer. *Id.*  Plaintiff later followed up with Fr. DePrinzo, who confirmed that there were no "major issues" with her work. *Id.* ¶ 28.

At some point after February 2023, Plaintiff alleges that she arrived at a meeting and was greeted with a condescending remark from Fr. DePrinzo's Executive Assistant, who questioned whether Plaintiff was supposed to be there. *Id.* ¶ 38.  Plaintiff says that she also noticed Dr. Pratt walking back and forth past the room with a "clear scowl on her face." *Id.*

---

Plaintiff believes that the Court did not properly understand her intention, she is encouraged to provide more clarity in any subsequent filings.

³ Plaintiff's Complaint and briefing spell this individual's name as "Father Arthur Pucaro," while Defendants aver in their briefing that it is spelled "Father Arthur Purcaro."  For consistency, I adopt Defendants' spelling.

In September 2023, Plaintiff met with a Human Resources Campus Representative to file a hostile work environment complaint based upon these incidents. *Id.* ¶ 39. The Representative explained that she could not help, but referred Plaintiff to Mr. Baladez, the Human Resources Manager. *Id.* ¶ 40.

On October 10, 2023, Plaintiff received a meeting request from Mr. Baladez to discuss her concerns. *Id.* ¶ 41. Plaintiff met with Mr. Baladez on October 11, and Mr. Baladez assured Plaintiff that he would talk to Fr. DePrinzo, Fr. Purcaro, and Dr. Pratt. *Id.* ¶¶ 42-43. But when Plaintiff was called into a meeting on October 27, 2023 with Mr. Baladez and Fr. DePrinzo expecting to discuss her complaint, Plaintiff was instead handed a separation agreement. *Id.* ¶ 45. Plaintiff was terminated that day. *Id.*

Following exhaustion of her administrative remedies, Plaintiff commenced this action.

## II. Standard of Review

Within the Third Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

## III. Discussion

I construe Plaintiff's complaint as raising both direct discrimination claims and hostile work environment claims, and construe Defendants' motion to dismiss as limited to the hostile work environment claims.

### A. Hostile Work Environment Discrimination

Plaintiff alleges a hostile work environment against the individual Defendants under 42 U.S.C. § 1981 and the PHRA, and against Villanova University under Title VII of the Civil Rights Act of 1964, § 1981, and the PHRA. Hostile work environment claims under Title VII, § 1981,

4

and the PHRA are evaluated under the same analytical framework. *See Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-182 (3d Cir. 2009) (the elements of a claim under § 1981 are identical to the elements of a Title VII claim); *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) ("[Pennsylvania courts] generally interpret the PHRA in accord with its federal counterparts"). Plaintiff raises race discrimination claims under all three statutes, and religious discrimination claims under Title VII and the PHRA only.

Under Title VII, § 1981, and the PHRA, an employer can be held liable for workplace harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986) (citations omitted). To succeed on a hostile work environment claim, a plaintiff must show that "1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability [meaning the employer is responsible]." *Castleberry v. STI Grp.,* 863 F.3d 259, 263 (3d Cir. 2017) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).

The standard for a hostile work environment claim is a daunting one, reserved for circumstances "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 15, 21 (1993) (citations omitted); *see also Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 280 (3d Cir. 2001) (explaining that "mere 'discourtesy or rudeness,' unless so severe or pervasive as to constitute an objective change in the conditions of employment," does not suffice for a hostile

work environment claim) (citations omitted).  "To judge whether such an environment is hostile or abusive, [a court] must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999) (citing *Harris*, 510 U.S. at 23).

Although the Third Circuit recognizes that allegations need only be severe *or* pervasive, Plaintiff can establish neither.  *See Castleberry,* 863 F.3d at 264.  Plaintiff therefore cannot clear the high bar that the Third Circuit has set to articulate a hostile work environment claim.

**B.  Plaintiff's allegations do  not describe conduct that was severe or pervasive**

Plaintiff articulates a total of six specific incidents, only two of which relate in any way to Plaintiffs' race or religion, over a period of a year and ten months.  Plaintiff first posits that her offer to support Villanova's "Lenten season writings" was rejected, in her view, because she is not Catholic.  Plaintiff also pleads that Dr. Pratt cautioned against widespread advertising of Villanova's newly commissioned painting of St. Augustine as a Black man, and Plaintiff found this remark to be racist.

Plaintiff's four remaining allegations are devoid of any explicit reference to Plaintiff's race or religion, and without more, cannot be read to harbor discriminatory animus.  Plaintiff alleges that Dr. Pratt said in multiple meetings how "Father Peter, the college President, likes her."  Next, Plaintiff contends that Defendants told her that she was not embracing the "Villanova way" or "collective process," which Plaintiff interprets as meaning "a priest or Catholic management operating process," – something to be expected at a Catholic university.  Finally, Plaintiff avers that Dr. Pratt and Fr. DePrinzo's Executive Assistant spoke to her in a condescending tone and

that Dr. Pratt scowled at her.  Plaintiff believes that these episodes disparage her non-Catholic faith, and perhaps also her race, but she provides no additional evidence to support this inference drawn from facially neutral remarks.

Turning first to pervasiveness, Plaintiff does not describe a deluge of harassment that could amount to an abusive work environment, even if I were to consider all six incidents.  "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racist slurs, there must be a steady barrage of opprobrious racial comments."  *Tourtellotte v. Eli Lilly & Co.,* No. 09-774, 2013 WL 1628603, at *8 (E.D. Pa. Apr. 16, 2013) (citations omitted).  Here, Plaintiff describes six instances over the span of a year and ten months, a frequency resembling sporadic and isolated incidents of discomfort, rather than the steady stream of harassment required to establish pervasiveness.  *See, e.g., Larochelle v. Wilmac Corp.*, 210 F.Supp.3d 658, 684-685 (E.D. Pa. 2016) (finding two specific incidents over a nearly three-year period to be too sporadic to demonstrate pervasiveness); *Rosati v. Colello*, 94 F.Supp.3d 704, 716 (E.D. Pa. 2015) (three specific incidents over a four-month period "is not a continuous period of harassment"); *Saidu–Kamara v. Parkway Corp.*, 155 F.Supp.2d 436, 439–40 (E.D. Pa. 2001) (finding four incidents over a period of a year and a half to be insufficient evidence of a hostile work environment).

Turning to severity, the allegations again fall short.  As recognized by the Supreme Court in *Faragher* and the Third Circuit in *Abramson,* mere "discourtesy or rudeness" will not suffice. *See Abramson,* 260 F.3d at 280 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). Thus, a co-worker's impressions about a painting or an off-hand comment about Plaintiff simply being a member of a different religion are, at best, innocent observations, or at worst, thoughtless remarks causing discomfort but ones that fall far short of the threshold of fundamentally altering

7

one's work environment. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004) (explaining that to establish a hostile work environment, one must allege "working conditions so intolerable that a reasonable person would have felt compelled to resign."). Plaintiff's remaining allegations boil down to a "scowl," a condescending remark, and several comments about her work performance. But "[s]nubs and unjust criticisms of one's work are not poisonous enough to create an actionable hostile work environment." *Sharpe v. Primex Garden Ctr.*, No. 23-4843, 2024 WL 3161755, at *7 (E.D. Pa. June 25, 2024) (citations omitted); *cf. Fields v. Am. Airlines, Inc.,* 696 F.Supp.3d 66, 114-115 (E.D. Pa. 2023) (collecting cases where objectively more egregious instances were deemed insufficiently severe under Third Circuit case law to establish a hostile work environment).

Because Plaintiff cannot show that she suffered severe or pervasive harassment, the Court need not address the remaining elements of a hostile work environment claim.

## IV. Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss will be granted. Plaintiff has amended once, and it seems improbable that further amendment will remedy these deficits. Nonetheless, dismissal is without prejudice, with Plaintiff permitted to amend one final time *if* she can credibly and in compliance with the requirements of Rule 11 of the Federal Rules of Civil Procedure set forth facts plausibly alleging a hostile work environment claim. An appropriate order follows.

 /s/ Gerald Austin McHugh  
United States District Judge